Good morning. I am here on behalf of Kelly Stephenson-Cotton. She is asking this court to reverse and remand the granting of summary judgment based on her claims on behalf of her husband, the decedent, Ronald Cotton. There were claims brought on behalf of Mr. Cotton for violations of his Fourth and Fourteenth Amendment right, pursuant to 42 U.S.C. 1983 and 1988, for the conditions of his confinement while he was in the custody of the Galveston County Jail, the delay and denial of his medical care while he was in the Galveston County Jail, as well as a failure to assess, failure to supervise, failure to train, and ratification by the policymaker of the unconstitutional acts that occurred in the jail, along with state law claims of wrongful death and survival. I do want to remind the court that this case does not involve qualified immunity. It does not involve clearly established law. This is a case purely dealing with deliberate indifference by the individuals in the Galveston County Jail, primarily the Galveston County private medical contractors. Now, Galveston, this jail and this system is known for rampant malpractice. That is clear. It's a fact. There's been multiple cases brought against the Galveston County Jail, and there's been a finding that there's no deliberate indifference, but it may fall under the guise of medical malpractice, and that's a result of many other deaths within the jail. This jail is ran by individuals with questionable medical reputations, and in fact, the . . . But, Meg, the reason you have those cases is because medical malpractice is not enough. Well, yes, Your Honor. That is true. That is true. But how much malpractice does it take to . . . Well, it takes deliberate indifference. I don't think you can blur those standards in terms of the standard of care and providing medical care and all that sort of thing. Deliberate indifference means they were deliberately indifferent. They did nothing for him. Absolutely. That's not true here. Well, I would have to disagree because there's a lot of cases that say . . . I understand what you're saying with nothing means, but oftentimes, a medical provider can provide care that is so cursory, so minimal, that it amounts to nothing. It amounts to deliberate indifference. But he was seen multiple times, correct? He was seen one time by Dr. Killian before he was sent to the holding cell in hell for 53 minutes before he was taken to the emergency room hospital. And prior to that, the day before, which was . . . that was on March 13th. And the day before that, on March 12th, that is the relevant period because on March 12th is when the LVN . . . there was an LVN that saw him, and that LVN decided that because of what he's complaining about, that she should . . . LVN Gregory, that she should perform an EKG, which she did. The EKG returned as Mr. Cott went back to his cell. He went back with some over-the-counter products. I think it was Colease and fiber medication. And so he went back to his cell, only to continue to beg and complain about being in so much pain, 10 out of 10. And so he was on the phone crying to his mother. His cellmates had compassion for him, and they tried to get him the attention that he needed for medical care until he collapsed. He collapsed . . . And when he was taken into custody, he didn't disclose any diabetes history, right? That's correct. He denied it when they asked him like an initial intake form kind of thing? That's what the record shows. Obviously, we don't know what Mr. Cotton told them. But you don't have anything to contradict that, do you? The record shows that he denied any diabetic history. Yes, that's correct. The medical records, the jail medical records indicates that he did not disclose that he had diabetes. But he was a regular at the jail. He suffered from psychosis. He suffered from bipolar disorder. He suffered from ADHD. He had these mental issues and schizophrenia that caused him to maybe not be the best historian of his medical, but the jail was fully aware of his . . . Where's your case that supports frequent inmates or folks who are there often that the prison officials are accountable for prior knowledge or for some higher standard? Well, I think it goes to mostly all these cases because it shows that there is a knowledge there. It shows that they are subjectively aware of his medical condition. In this case . . . Where's your evidence that supports that they were aware of his conditions, these particular defendants, not just while he was in prison earlier? Right. So it would be these defendants, it would be the medical provider, and that is his jail medical record. His jail medical record shows that he was on a glucose protocol in the past, and they were monitoring his glucose in the past. And that gives . . . And the appellees here admit that they always, at all times, had access to his medical records. It's in an electronic file. So when he started presenting with all these symptoms, it was looking to see what his medical history looked like. We're back to arguing a medical malpractice case, not a deliberate indifference case. Well, that's . . . I think that that exactly is what ends up amounting to deliberate indifference because if you have the knowledge that a person has this medical history  that you can't deny that . . . There's no cases, you know, the law is what it is. No matter how gross-gross the negligence may be, you know, the case is just there. That's not synonymous with deliberate indifference, lack of a limit, that just sort of what the law is. From farmers to hair and on down, we have a lot of these cases where looking at them facially, negligence, gross negligence, et cetera, you know what the doctrine is and so the questions you're facing is, you know, blindness to medical records, whatever the case may be, you know, what's a case that says there's enough of that that can establish the mental element of deliberate indifference? So what's the case you say, you know, gets you to establishing the mental element of deliberate indifference? We know what your argument is about what didn't happen, but, you know, kind of on that front, and I got another question once you answer that one. Okay, if I could just draw it back a little bit. Notwithstanding the diabetes, notwithstanding the glucose monitoring, I don't have a case that I wasn't . . . this was not a part of what I was expecting, and I apologize for that, but I don't have a case that says that in this, you know, specifically, which is not required for this type of case. It's not a qualified immunity case. Well, you don't, but you don't have qualified immunity here, which we frequently have, so that's off the table, but you still have deliberate indifference. Right. So that's what the case is established on, so it's not about what's in the record, what we think, whatever, unless it fits into what the cases have said. Now, that's different. I think you have a pending state court case, right? Correct, yes. So, I mean, it may be different in state court in terms of proving whatever Texas requires on those elements, but here you've got the uphill sledge, and I'm just asking, not to trick you, but, you know, like what you're arguing, what they knew, what they should have known, as opposed to, you know, someone, you take Ramos, you know, other cases where it's obvious the guy's groveling in his own excrement, et cetera, et cetera, the court says, hey, that's it. So, what's your risk case, you know, just say what it is, that gets you there, and when you get past that, I want to ask you about, it's up on summary judgment, you know, two of them, and part of the argument you make is that the district court did not to your client, so my question from that is going to be, you know, what's the evidence you're relying on in terms of that, but for the minute, just stay with the deliberate indifference and just, you know, if you have one, if you don't, you know, we read the briefs, and the whole point of why we put the case on for argument as opposed to deciding it in a way, we can just read the case and give you and counsel opposite the best shot at, you know, sort of probing the questions. Yes, Your Honor. So, as I was, if I could just draw it back just a moment, talking, I talked about, it seems the court does not, believes that I need a case to show that the glucose knowledge of the past history is required, and I don't have that case right now. However, I don't think it stops here. I don't think that is the sole basis for the deliberate indifference in this case. Again, Mr. Cotton went, and I want to just insulate a certain period, and that is March 2nd and March 13th. Anything that happened before then is not relevant to now as far as medical care is concerned. Any medical care prior to that is not relevant. When he presented to the medical providers from a layperson recognizing his serious medical need, the jailer saying, bringing him to the medical clinic saying he's vomiting, he has bloodless vomit, he has, his cellmate said that he has undigested food, and he's in this excruciating pain. They took him to the medical clinic. Correct. They took him to the medical clinic, but nothing happened. They gave him an EKG. Nothing happened. There are cases that are on point as far as the cursory medical examination. There are cases from this circuit that states that, in fact, it's Ledesma. It's in my brief, but Ledesma versus Swartz. It states that, in that case, the inmate complained of a broken jaw, and there was nothing done for him except for giving him over-the-counter remedies, which was Motrin, and he was told to start a liquid diet. There's another case out of this court, the Fifth Circuit, where that's Austin v. Johnson. In that case, that person actually, just like Mr. Cotton, was very dehydrated, and he just kept complaining about being thirsty, and he fell out, just like Mr. Cotton. And in that case, they were able to resuscitate him, but this court found that because the jail waited, they waited about an hour, a little over an hour, to send him to the emergency room, that that amounted to a delay in medical care and delivery indifference, and that is the he complained about the EKG. He complained about, excuse me, there was this EKG that was known, and Dr. Killian put him in a holding cell instead of calling emergency services where there were medical personnel, medical modalities, and so forth to assist him and take his blood sugar on the way so the hospital could actually be prepared when he did arrive for that case. So he was carried in a police cruiser, right? That's correct. Was it marked or unmarked? That's not detailed, and that's not detailed in the facts, but they've done this before, and I've stated that case here, that's Denise Pope, where she was having a miscarriage, and she was forced to wait to be transported non-emergent and given a blanket to soak up the I mean, the reality is that ambulances can easily take 30, 45 minutes to get to a call. I mean, I've had that experience in my family where you're waiting. So I mean, again, this is kind of like, this is a medical malpractice argument we're talking about, not a deliberate indifference argument. I would say that when you look at the totality of the fact that he didn't see a medical provider that can do something, the LVNs are medical providers, but their hands are tied. They're prohibited from doing what they want to do. They cannot actually treat him. They cannot actually do anything. Their hands are absolutely tied. All they can do is report to the doctor what they found, and this doctor did nothing. All right. Ms. Lewis, you've preserved your rebuttal time. Thank you. All right. We'll hear Mr. Blucher. Blucher. Did I mispronounce your name? I didn't mean to. Correct, Your Honor. Okay. Usually people get it wrong, but you did not. All right. May it please the Court, Daniel Blucher for the health care defendants. The issue in this case, as you all mentioned, it's about whether or not there was deliberate indifference. The district court correctly dismissed appellant's claims. Deliberate indifference, as the Court's aware, is an extremely high standard. As the Court mentioned, this is appellants really making malpractice claims. Malpractice doesn't get you there. For deliberate indifference to exist, the defendant has to be aware of the facts that give rise to the inference that there's a substantial risk of serious harm. They have to actually draw the inference, and then they have to disregard the risk by failing to provide treatment. Appellant mentioned that the important time period is between March 12th and March 13th of 2019. In the morning of March 12th, Cotton visited the clinic. He was complaining of chest pain and his sternum had constipation. The pain subsided, and he said he thought he was having acid reflux. He was given Tums, and the EKG was also taken at that time. It showed mild tachycardia, nothing more, and that EKG was provided to the doctor. That night, he came back saying he was constipated for 10 days. He had previously given milk of magnesia. He said it didn't help. His vitals were taken. The doctor was called. Fiber and cholecystitial laxative. The next morning, he was found to be vomiting by one of the deputies. He visited the clinic. Again, complaining of abdominal pain, not having a bowel movement for 10 days. The doctor was called again. He ordered x-rays for the next day, sent him back to the pod so he could be tested later, and then they could further figure out what was wrong with him. Did anybody look at his records? At his prior health records? I'm not sure, Your Honor, but I will mention a pellet referenced in his records. There was the glucose monitoring. That is a single record from 2016. In 2016, when he was admitted, he said he had hypoglycemia, and there was a single blood test showing a glucose level of 82, which is within the normal range. So even if the doctors had looked at that, that's a wide, logical leap between seeing that there was something going on with his blood glucose, maybe, and a set-in-stone diagnosis of diabetes that they would have been aware of. So after the x-ray is ordered, he's sent back to his pod. They find him at 4.48 p.m. on the floor, huffing and puffing. That's the time when he complains of the 10-out-of-10 pain on March 13th in the evening. He's immediately taken back to the clinic. At that point, Dr. Killian and a nurse try to get an IV started. They give him a lot of water. That's the point where they decide to transfer him to the hospital. While he's waiting for the transport to come, they put him on oxygen, and they try to get him to drink more water. He doesn't drink it. He arrives at UTMB at 6.38. Insulin, after testing, is started at 11.01. His health quickly declines at 11.57. He's declared dead at 12.44 a.m. Now, while he was in the jail, every time he raised a medical complaint, he was brought to a nurse or a doctor, and the nurse would look at him and communicate with the doctor in some way or refer him to the doctor. They had, as I said, they had no knowledge of his diabetes. And as a defense expert, Dr. Stooker, pointed out, so the cause of his death was diabetic ketoacidosis. And in a patient without a known history of diabetes, it's very hard to diagnose because it presents with nonspecific symptoms. You get constipation, dehydration, vomiting, sometimes headaches. There are symptoms that don't point to an obvious thing. There are some diseases where it's obvious. You have chest pain. You're short of breath. Your arm's hurting. Everybody knows that's a heart attack. A layperson will know that's a heart attack. He presents with constipation. That's a lot of things cause constipation. A lot of things cause dehydration. With the knowledge that the medical professionals at the jail had at the time, they gave him reasonable health care. It doesn't even rise to malpractice. But even if you take appellant's arguments as true, this doesn't raise a claim of deliberate indifference. It's really, as you said, Judge Wilson, a malpractice claim. And that just doesn't . . . Let's talk about the evidence. One of the arguments counsel opposite makes is that the court, the district court improperly weighed facts and didn't give the plaintiffs the inference that they're entitled to a summary judgment. Can you respond to that? Well, they have to show deliberate indifference. There has to be the inference of . . . There has to be the evidence for the substantial risk. They have to actually show that the defendant drew the inference. All they have is that there is this record of hypoglycemia and the normal test back in 2016. They don't actually have any evidence that the doctors looked at it. And even if the doctors did look at it, as I said before, that's a wide logical leap they have to make from seeing he had something going on with his glucose back in 2016 to saying, yes, he has diabetes and we need to take care of that. And there's no evidence that that happened. And so you don't even get to the point of them possibly disregarding the risk he had because they weren't even aware of the risk because they simply didn't have the information to draw the inference. I'd also point out, I'd just like to clarify, counsel stated that he was unconscious. There's no evidence that he was found unconscious. He was found on the ground huffing and puffing, I believe by one of the deputies. And he was talking to the deputy at the time and asked to go to be transferred to UTMB and was able to walk to the clinic with assistance. He was not unconscious. I would also point out, Appellant's counsel cited a couple of cases. In Austin v. Johnson, there was a fact issue about deliberate indifference. And in that case, a miner fell unconscious due to heat stroke at a boot camp. And he was unconscious for an hour and 42 minutes before they decided to call an ambulance. Now, there was a slight delay in this case, but this isn't anywhere near the same level. Someone being unconscious is a serious emergency. Whereas in this case, all they knew at the time was that Cotton was dehydrated and he was very constipated. And that's all they really knew. They knew they needed more information and they knew it would be a good idea to send him to the hospital for better care. But they didn't sit around. When they decided to send him to the hospital, was it before the cruiser or transport showed up? I believe it was 57 minutes. So that 53 or 57, whatever that time frame is, that's how long he actually waited for the car to come pick him up, not including transport time to the hospital. I believe so. And during that time, they started him on oxygen and tried to get him to drink more water since they had tried to start an IV in him numerous times to get him hydrated. And they just couldn't get an IV started. They got him to drink several glasses of water initially. And while in the intervening time, while he was waiting for the cruiser to come, they tried to get him to drink more and he declined to drink more. I will also point out, as the court already mentioned, he denied having diabetes on intake. He further denied having diabetes upon arriving at the hospital and actually told the health care professionals there that he wanted to leave and he had to be convinced not to leave. That's about all I have. There's any more questions? No. Thank you. I yield the rest of my time to my co-defendants. OK. Thank you. Yes, Your Honor. Robert Booth on behalf of Galveston County and Chair Henry Trosteset. I'd like to address the conditions of confinement theory. Here, the appellate contends there's a policy of using LVNs as gatekeepers and that the Galveston County Jail, that's a condition of confinement causing a delay in treatment. The facts in this record indicate that the LVNs, every time there's a medical complaint, they respond. They make medical records. They offer treatment. The record's pretty replete with every time he makes a complaint, there's a pretty prompt response by the LVNs to provide medical treatment. This court has already addressed whether or not the use of LVNs is a condition of confinement that would lead to a cause of action here. We cited to the estate of Henson versus Wichita City. And so, there's not a need to have a registered nurse. LVNs are completely appropriate in a jail setting. The next issue I want to talk about is the issue of the non-emergency transport. Once the decision is made to transport him to UTMB, one thing that's important is we have to wait for a sheriff deputy to become available. I believe that you would need to have a sheriff's deputy available if he was going to be transferred by an EMS or a squad car. Here, while he's waiting for the deputy and the squad car to become available, he is provided treatment. And so, they are responding to his medical complaints. I will say that the delay of 15 minutes or so of getting him over there, one, I don't think that's a delay. Two, there's no evidence in this record that had there been an emergency transport that he would have gotten there sooner or that he would have received better medical care. Well, but, I mean, counsel, opposite makes the point that at least when an ambulance shows up, and I mean, I agree, you can wait for a while for the ambulance to actually show up, but there are medical professionals, paramedical professionals there who can begin doing things and can phone ahead to the hospital or whatever. That's not going to happen under the county's current mode of transport. No doubt, but that is not a cause of the outcome for Mr. Cotton here. The medical records that are in the record from UTMB, which are at 361 of the record, show when Mr. Cotton gets there, they immediately do a blood test. They immediately suspect that he is having some sort of ketoacidosis and they immediately start treating him for that. And so, and that's, so they do that test upon arrival just as they could have done that test in the, in the, in the. But if he'd gotten to the hospital 45 minutes earlier, would that have made a difference? I don't think so. Not on this record, because if you look at the UTB medical records, they specifically show that there's a period of time where Mr. Cotton is very combative. He is denying medical treatment. He's requesting to go back to the jail. The jail tells him, if you go back to the jail, there's a chance you could die. He's actually in the hospital for like five or six hours before he ultimately, you know, has the episode that results in his death. And so, there, there, there is a delay, which I think could be attributable just as much to Mr. Cotton and, and whatever he was undergoing at the time. And so, I don't believe that there's, there's evidence in this record that the use of a non-emergency medical transport is a evidence of a de facto policy of some sort of conscious indifference to Mr. Cotton and his health. And I should also say there's no evidence in this record that the Galveston County and Sheriff Trostiset have a de facto policy of denying non-emergency, of denying emergency transport. State another way, we don't always take prisoners to the jail using a squad car. Opposite counsel mentioned the Bage case. I believe that case, which this court has affirmed the summary judgment, that case was the, the patient was, the prisoner was undergoing a cardiac arrest. I believe they were transferred via emergency transport. And so, there's not evidence in this record that we always deny emergency transport. Is it, in this case, was the determination, well, you just said not, but if there was thought of him having a heart attack or something, would that have altered Colin's emergence? Or in other words, transporting him in the Sheriff's vehicle, was that predicated on what information was known in terms of the constipation, as opposed to something life-threatening? I may not. Let me ask it another way. What is the policy? The policy is to defer to the judgment of the medical professionals. And if it requires emergency transport, life-threatening, then they, then they, then they, they call an EMS. I, I, I suspect, and I don't think it's in this record, but there's probably multiple considerations about what, when emergency transport is going to be utilized. Probably the, the availability of squad cars, availability of deputies, the availability of timely emergency medical transport. This jail is about 40 blocks away from the, from the UTMV emergency room. There is a road that goes between them. It's, it's maybe a 10-minute drive. It's, it's not a, it's not a road that backs up with traffic. And so these are all conditions that would be known to the sheriff's deputies and the sheriff's department in making those decisions. It's not, Galveston's a, it's not a huge town. Uh, they, they have a world-class medical institution just miles away. And so it's not, it's, it's, there was never, never like a need for like a helicopter or anything like that. It's a pretty, pretty proximate, uh, uh, DR is proximate to the jail. And so, um, and then, uh, just most important when, when, when we look at the medical records of what Cotton actually did when he got to the jail and his, his delay in, in, in agreeing to the treatment, his, um, you know, request to go back to the jail, um, you know, it's, he walks in ambulatory. He, he is asking to go back to the jail. That is, that is not somebody that you would think that is, is on the verge of dying. But that's, that's what he wanted to do. And it was only through the efforts of UTMB to convince him to stay. Did he stay and undergo more treatment? Was there some indication he might've been, you know, having a diabetic episode to where, you know, sometimes when people having a diabetic, you know, they're fuzzy in their thinking, can't make a judgment or whatever. Was it anything in the record? You know? Yes, sir. The, the, the, the, the medical records from UTMB show that he is, um, breathing heavily and that's why they immediately do the glucose test. They immediately suspect that he's going through ketoacidosis and they, um, I think they adequately convince him, adequately treat him to try to convince him to stay because they knew that he may not be making the best decisions. And so they, um, they did not send him back to the jail. They kept him there. They ultimately put him in the emergency room, uh, where he, where he passed away. And so, um, when viewing the evidence in light of what's favorable, no reasonable jury could conclude that the county had a policy of delaying medical treatment, nor does the evidence establish that the county delayed medical treatment causing Mr. Cotton's, um, unfortunate death. We ask that you affirm. So let me ask you, just as to the points you argued, what is the quality of the evidence on those points? Is it somebody's testimony, affidavits? What is it? Kind of a one, two, three, four. Sure. The, um, it's all, it's all the medical records, their electronic medical records. And so, um, I would look at the, um, the, the jail medical records at 370. I would look at, um, a record on appeal, uh, 539, which shows that when Mr. Cotton arrived at the jail, he had a 99% chance of survival. And then I would also look at the UTB medical records at 361, which show the timeline of his treatment and that he, um, was given, um, that he was, uh, at the hospital with a, with, um, with, for, for many hours before he died. And so the, the, uh, UTB could provide him, uh, medical treatment. And what was the cause of death? It was a heart attack. And I should mention that the EKG would not have revealed that he was about to have a heart, a heart attack. That's not, that's not what the record shows in terms of the medical. Okay. Yes. Thank you. All right, counsel, you have rebuttal. Yes, I, um, I want to address a few things that wasn't mentioned here. The EKG, uh, he did die. It was just cleared up that he did die of, um, of a, uh, cardiac arrest. And there's no medical evidence, uh, whatsoever that the jail would not have known, uh, excuse me, that would have not alerted the jail that he was going to die of cardiac arrest. That is, that was part of the symptoms that came with the, um, uh, ketoacidosis, um, diabetic symptoms that he was having. And I want to point out that Mr. Cotton does have a psychotic diagnosis background. So when he got to the hospital and he was fighting, you know, fighting back and forth with whether he should get here or not at the, at the hospital, that is something, his mental state, according to the plaintiff's expert in this, um, in the record, it said that the psychosis likely, um, caused him to have these, um, inhibitions about continuing. And we have to remember at the hospital, um, that they were denying him water. He wasn't getting any water, uh, at the hospital. They've said that they offered things to him and he refused it and so forth. And as I'm asking that he might've been confused and so forth, there's a record. And that, and that, and that's what I want to point out that, um, he, the hospital records clearly show and, um, is actually in the, the Texas Rangers report as well in the, um, record excerpts, uh, that were, that were submitted to the court. But, um, it, it clearly states in there that the hospital, the nurse at the hospital said that he couldn't have water at that time. So he's handcuffed, um, at the hospital and he's not allowed to have water at the hospital. So I think logically for him, where can he, where would he be uncuffed and allowed to have water? And that would be back to- What in the record says he was disallowed from having water? Um, Your Honor, I'm, I, I apologize. That's all right. I don't want to take your time. I thought I heard somewhere they were offering him water. He refused it. This is sort of a back and forth. No, the, the, the nurse actually stated you have to wait for the doctor to arrive and then, um, and, and would not give him any water at that point in time. Um, I wanted to also, uh, point out- Back to the point before you end, because the main argument you make in the brief is that the court, uh, did not construe the evidence in the light most favorable to you. Therefore, summary judgment was not entitled to as a matter of law. So before you end up at some point, explain to us, you know, what is the evidence you say the court did not view in the light most favorable to your client that gets you to where you need to be? Well, that would be the care that, that occurred or didn't occur at the jail. I think that's the most important. And I want to point out that the plaintiff's, excuse me, the defendant's experts, um, actually stated that had he gotten, had the, had the, um, even though he had an 899 blood sugar level at the time that he arrived at the hospital, they, they, in a normal range is like, I believe the highest is like 140. Um, he, his was 899 and their experts stated that, um, that he, it was reversible. Um, that's what he claims. It was reversible. Had he gotten there, had they treated him sooner? So that goes back to the delay in medical care at the jail and, and delaying getting him there by nearly an hour. Even their own experts, you know, makes that clear. And, um, that, that, and, and then we go back to the cases and, and they're, they're my brief and they're, um, actually outlined in 15, 15 through, um, 15 through 22. It, I mean, these cases are pretty evident that if you apply with, with the court applied in these cases to this case, that there, there should be deliberate indifference found in, in this particular case. Um, in, in, um, Galvin versus, uh, Calhoun County, the, the, uh, medical provider gave Pepto Bismol and home remedies and assessed him and they found there was deliberate indifference. Um, my, my time is winding down, but I do want to leave you all with this. Um, there is, if there is a, um, a policy of tortious actions, that is, that is also actionable under 1983. If you have a policy and you have, um, you have these medical providers constantly providing practice that is, uh, excuse me, medical care that is amounts to malpractice, that is a custom within the jail that can amount to deliberate indifference and, um, a constitutional violation. That is, um, and that would be, um, under the Board of Commissioners of City of Bryan, excuse me, Bryan County. Thank you. Thank you. But most of the cases in your brief on this, uh, you know, condition of confinement, et cetera, most of them are from other circuits. Eleventh Circuit, Tenth Circuit, et cetera, et cetera. So, you know, Seventh Circuit, I mean, I'm flipping at it. I'm looking at it. I mean, you read the brief, but once you started arguing, I flipped back to it. So, here's my question. Um, what's your best Fifth Circuit case that fits the argument that you're making to . . . not that those other cases are not helpful, but I'm just saying, what's your best Fifth Circuit case that on a summary judgment record such as this would, uh, have us reverse the summary judgment either for there's disputed facts or, um, under deliberate indifference? The best Fifth Circuit case. It's not a trick question, I promise you. It's just, you know, the value of having the lawyer standing. This court, I wanted to commit it to memory, and I'm old. I'm getting in my fifties. I can't remember as well as I used to. Fifties? What are you talking about? I'm sorry. I don't mean to disrespect . . . I hear what you're saying. Oh, wait a minute. Well, you probably remember when the decline started. I'm going to take that personally after a while. I'm going to ask you a friendly question. The decline has begun, I'll say. And with that, there was a case that was just handed down in this court, but I would point the case to one of my cases, actually. It was Allen v. Hayes. That was a case showing a delay in medical care. What did amount to deliberate indifference? As well as this Galvin v. Calhoun County. That one is a 2018 case from this court. It is published, but I think it's guiding as well as SABE and DRYER and . . . Yes, as far as the deliberate indifference with using LVNs who have their hands tied and can't do anything but report back to the doctor. Thank you all for your time. All right. Well, thank you for your . . . They're both counsel. We like, speaking for Judge Wilson, we like oral arguments. We like to have the lawyers. I mean, it's one of these cases, the lawyers don't want to come and we can figure out why that is because they don't want to get thinned down on the questions, but oral argument is valuable for fleshing it out. We're going to read the record. We've read the briefs. You help us to know where to look and so forth and decide the case as best we can. We appreciate counsel coming to address the questions and so forth, but we'll review it carefully and we'll sort it out. So thanks to counsel in this case and in the other cases. That concludes the orally argued cases that we have today. So they, along with the non-orally argued, will be taken under submission. With that, the panel stands and recess until 9 a.m. tomorrow morning.